Good morning, Your Honor. We had three issues presented in our appeal, and as to the response of the appellees, I don't really need to go into the first issue, which is the judge's rat-a-bank-o sanction of my client's statement. Mostly because, as I pointed out in my brief, his statement had originally been drafted and written long before his deposition and not after. So it wasn't a subsequent statement that was designed to make an issue of material fact. It was something that came before, and if you read the deposition, as I pointed out in the brief, what he says in October 10th of 2001 is, now, if I cut leaves, I'll throw them in the trash. He's speaking about October 10th, whereas on August of 2000 and before and when the search had taken place in 98, he hadn't thrown anything in the trash, and I think he was clear on that. Well, suppose that we just forget about that. Okay. Part of what the district court did. What is your argument that he made a substantial showing? Well, that's where we get to, because I think they also sort of conceded materiality on the issue. So it does come to whether or not he made a substantial showing that there was falsehood, and it would have to be deliberate falsehood in the procurement of the warrant. Well, denial is not enough. A denial is not enough. Now, what informed our opinion that there was a substantial showing initially was that there was like ten cases that came forward where the exact same language was used by the officer, the same officer that he had gone and done a trash search and that he had found fresh, green, moist marijuana recently cut from a mature marijuana plant. And in each of those cases, people came forward and said that couldn't be. Now, subsequent to the filing of the notice appeal and after the writing, before the writing of the brief, as I pointed out in my brief, in the related case of Miller, which is also in a docket of this court today, the district court judge ruled that none of the evidence from other cases is going to be allowed in in the Miller case to come in to impeach the officer. Quite properly, don't you think? What relevance does it have into this case? As to this case? Well, it was a difficult evidentiary issue. I briefed it and I thought that it would have helped our case immeasurably, but the judge did rule it wasn't going to come in. Well, you're making the allegation there's a false affidavit by Officer Grant. Isn't that what you're saying? That is correct. As to the issue. And what is the showing that you have made that Officer Grant purposely lied in his affidavit? Well, as I said, what originally informed us that he lied was Mr. DeArclan stating that he couldn't, that he didn't put anything in the trash, and that his plants weren't big enough, that he had just got these clones. It was the first time that he was growing them. Okay, but the affidavit said they were found in the trash. That doesn't mean that Mr. DeArclan's affidavit, counter-affidavit saying that, well, he didn't put them there, that doesn't mean they weren't there. I don't see the conflict here. There's nothing that establishes or even raises an inference that there's a falsity. Well, we're looking for a substantial showing that requires some sort of corroboration, or some officer certainly is coming forward and saying that it didn't happen, as in one of the cases that's cited on this. We don't have that. The only thing that we do have is that Mr. DeArclan says he didn't throw anything in the trash. Who has the burden of showing that it was false? We have the burden of showing that it was false. And the thing is that the officer gets an inference that even if my client's telling the truth, somebody else must have thrown that in the trash. We don't get an inference that my client says that he didn't throw anything in the trash, and therefore there was nothing in the trash. And that seems to me that that would be better suited as a credibility determination given to the jury on what inferences they want to draw. In fact, an inference usually seems to be in crash cases. For instance, the officers, you know, sometimes and making a probable cause showing to go go through somebody's trash. Right. And discard trash as well. I found these items in the trash. The inferences that came from the person who was living there. Right. So I think the inference is, you know, if if if he says he found it in the trash, the reasonable inference to be drawn against the person moving for summary judgment, meaning the officer would be. Yes. You know, he's saying it came from the house. I mean, that's that's the that's the only basis for getting probable cause. Right. That he believes it came from the house. We believe somebody from the street put it in. There's no basis to get the affidavit. That's correct. And that's basically what the magistrate has to conclude, that the trash comes from the house when he sees it there. And we have somebody from the house who had that was his trash can for the separate residents saying he didn't put anything in the trash. I don't have any other independent corroboration. I can't change the facts. And, you know, I certainly don't have anything other than what Mr. DeArco said. There were a lot of other people that made this allegation against this officer at that time. And the officer used identical language in each of the affidavits that he procured. Now, as it turns out, the district court judge. And I think this panel may agree that that's not relevant and wouldn't come in in the case in chief, which is why one of the reasons I didn't include all of that to try to bootstrap the substantial showing, because it doesn't make sense to try to get over one hurdle and then go to trial and not be able to put the evidence on there. So what we have is what we have. What Mr. DeArco and states in the inferences, it can be drawn from it. Can I ask you a question about the outbuildings issue? Yes. Unless you wanted to skip that or no, I want to get to right now. Oh, go ahead. Go ahead. I want to hear your position. As to the outbuildings issue, what the evidence that we have is two. There's two points when they initially come upon the outbuilding. Should they have entered an after entry? Should they have ceased searching at some point when they realized that it was a residence or should they have realized that it was a residence? Well, the warrant says outbuildings. Right. OK. So what's the defense? The fact that sometimes there is a different address used for that building. Is that that your argument? The defense is that if it's actually a separate residence and it's not an outbuilding, it needs to have a warrant in order for them to enter it. But an outbuilding is still an outbuilding whether or not somebody lives in it, isn't it? No, I don't believe that's true. I think if it's a residence, it's a residence. If it's an outbuilding, then it's somehow attached or being used as part of the other residence that the search warrant, that the initial search warrant would be designed to allow entry into. And it's just because it's somewhere located on the property. It may be a separate residence. Where was this and where was Mr. Yorkland found? He was in the main residence in the front. Not in the B residence, but in the eight five five three A residence. So it really wasn't all that separate. If he felt he could move interchangeably between the two buildings, all of which is on the same property. I guess I'm not sure I understand your argument. Well, as an unfortunate inference, he happened to have just gone up there that morning because he had some business to take care of with one of his sons. But he didn't use that residence and never went in there. The most telling is that whether or not they realized because of the separate driveway, because of the separate power meter, because of the separate garage that the residence has or the fact that it's uncontradicted, that it was clearly marked eight five five three B, whether or not they realized when they came upon it that it was a separate residence, certainly the testimony of Officer Bassena in his deposition when he goes in and enters and is asked, what did you see? He says, I see a residence. Appeared to be a residence is what Bassena says. And then two sentences later, he clears that up by saying, well, people could turn an outbuilding or a barn into a residence. I don't think just because an officer is trained to characterize some unit as an outbuilding or a barn that that makes it an outbuilding or a barn for purposes of the Fourth Amendment. It's a residence if it's a residence. Now, wait a minute. What is the violation of the Fourth Amendment here? The fact that they searched without a warrant. The warrant didn't cover eight five five three B. It didn't mark eight five five three. What the warrant covered was eight five five three and any outbuildings. So the question is whether or not this was an outbuilding within the meaning of the warrant or it wasn't. Certainly when Mr. Bassena comes into the property, even if he doesn't realize it before and sees that it's a separate residence, at that point he should know it's a separate residence and they should procure a second search warrant for it. That's the position, at least, that we that we are advancing. Okay. And let me save a minute for rebuttal. Okay. Thank you. Morning. David Husky for appellee officers. Grant and good pastor Bassana and Potter. And on the issue of judicial deception, I agree. The issue is what constitutes a substantial showing. And the related issue of what reasonable inference can be drawn from these facts. And I think the facts here that show reasonable inference can't be drawn that Mr. That officer Grant lied are the fact that the plaintiffs have had. There's no showing of how else Grant could have discovered that Mr. was growing marijuana. Mr. says it was an indoor or it was, in fact, an indoor grow. So it couldn't be observed from the air. Couldn't be observed from the street. He says he was growing it for personal use under Prop 215. So and that he was the only person growing. So there was not likely to be any informants. Basically, Officer Grant had no other basis for believing that that Mr. was growing marijuana unless he found marijuana in the garbage. And I believe that Mr. statement does not directly contradict that of Officer Grant. It can both be true. As to the claim for relief for a search exceeding the scope of the warrant, I believe the facts are such that certainly a reasonable officer could have believed that the outbuilding or that 8 5 5 3 B was an outbuilding. As far as I understand it. First of all, before they secured the warrant, they made they made an examination of the power usage records. Right. Yes. And compared the 8 5 5 3 with I think, you know, other units around there. Right. That's correct. Now, from that examination, it seems to be a reasonable person would know that 8 5 5 3 B has a separate power record. It's a separate unit. Wouldn't wouldn't that be apparent from if as he says in his affidavit, he examined the power usage not only of 8 5 5 B, but of the neighbors. Actually, his his his his affidavit says he examined the power records of 8 5 5 3. Well, no. He also said it exceeded what. Why was it suspicious? And yes. And and other neighbors. We don't know which. Well, that I mean, the closest neighbor is 8 5 5 B. The closest neighbor was a separate power source. So the inferences. I mean, if you draw the inferences on summary judgment in favor of the opposing party, the inference is a reasonable person would have known that 8 5 5 B had a separate power record. So it must be a separate unit. Right. Well, your honor, there is nothing in the. Well, my question is, isn't that a reasonable inference from the record? And my response is, your honor, that I don't believe that that's in the record. There's no what I mean by that. What I mean is there's no indication in the record of what properties he compared against that. I don't believe that the officer ever saw records for 8 5 5 3 B. I know, but the reasonable inference when he says the neighbors that, you know, probably included the closest neighbor. Isn't that the reasonable inference? Well, your honor, I think it's speculation because there's simply no evidence in the record as to what other. And we don't know how the power bills came. There's nothing in the record. I thought that they would. I thought that the record indicated that both that these these all these buildings were getting power from the same. And a single bill. Isn't that right? There's a single bill for the entire property, which included the outbuildings and the main house. I believe the record is silent as to whether it was a single bill. What other. Oh, OK. So I don't think we know. We know. That's why I don't think that's why I say I don't believe it's in the record. And by the same token, there's no there's nothing in the record or even an inference that there were separate billings between the outbuilding and the main home. I believe Mr. DeArclan made a declaration where I think he said that I can't remember the exact language. There is a separate something separate with regard to the power and 8 5 5 3 B. But I don't think it's clear that that made it separate, that he got separate records. I don't think that's clear in the record as to what. And I don't. And basically that was not raised to the trial court. Now, same with the outbuilding. I mean, once you open the door, I don't want to call it to 8 5 5 B, the barn or whatever it is. Apparently it's it's readily apparent that it's a it's a residence, right? Yes, Your Honor. What? Once the son opened the door, he could see that it was a converted room. However, the circumstance, the overall circumstances there where I think we're at best ambiguous because Mr. DeArclan was found in the main residence and Mr. DeArclan records were found in the main residence. Well, but that's after the fact. What I'm looking to is, you know, the reasonableness of continuing with the search and continuing with the assumption that it's an outbuilding. At the time you open the door, you look in and you see this is a separate living unit. Your Honor, I think also there's a separate room in 8 5 5 3 B. But the rest of it is a garage and a converted barn. Is there anything to indicate that a different person was living in 8 5 5 3? No. It could have been a guest house. It could have been a home office. It could have been. I think the facts suggested it was associated with 8 5 5 3. And that was corroborated later when they find Mr. DeArclan in 8 5 5 3. And they also find his records in 8 5 5 3. Does the record indicate whether the officers knew that a B had a separate address of B on it? No. Well, what the record says. Did they see that when they went in? No. The officers say they did not. Plaintiff's declaration says it was clearly marked, but it doesn't say how or where it was clearly marked. And the officer's testimony was it's in the back. When we were doing our search, we weren't looking for numbers. He had a record of three felonies. They were trying to get in and secure the residence quickly and secure all parties there. And they said they didn't see it. And there's nothing in the record saying where this is allegedly clearly marked. Mr. Shirley suggests that perhaps we might make a legal rule that an outbuilding is no longer an outbuilding if somebody is living in it. What's your response? I think outbuilding is not the clearest term in the world. I think it suggests of the building that was in this case. I don't think the fact that someone's living there is enough to distinguish a building in the back of a main residence and to turn that into a residence rather than an outbuilding without any other facts. And that's the only fact here was that he allegedly lived there. I take it the plaintiff's burden is to show that there was a lie or a falsehood. An intentional falsehood as to a material point fact in the affidavit. The other thing, just briefly, if I could point out, as to the issue of the outbuilding, the district court judge looked at all the facts and believed that the outbuilding was covered by the scope of the warrant. I think at worst, worst-case scenario, it was an ambiguous situation that the officer was faced with and that a reasonable officer in the position of Officer Bassan and the other officers would not have known that the outbuilding was not covered by the warrant. And they're entitled to a qualified – if a district court judge, viewing all the facts in the quiet of a judge's chamber, can make that error, I think the officers ought to have qualified immunity of good faith out on the scene because it's certainly not a clear situation. Thank you. Thank you. You have a minute. One quick issue. It doesn't come up in the briefs but might help explain something. How Officer Grant knew that there was actually marijuana being grown in all of these residences was because they were getting information from the only local hydroponic store about who was buying clones at that time, and the hydroponic store at that time was selling clone plants. They no longer do. So his rate of success in terms of finding people that were actually growing marijuana should not necessarily be used to bootstrap in why the information he was developing should be viewed as legitimate or not legitimate. I thought he found cuttings in the garbage. I don't believe that he did find cuttings in the garbage. If you believe that he found cuttings in the garbage, then there's no issue of falsity in the warrant and there's no case. So if he found cuttings – That's your point. That's my point. But you say he didn't because your client said that he didn't start – that he didn't put any in them. Yeah, and also what informed it. And these are not inconsistent statements, as Mr. Husky points out. I'm out of time, so I'm sorry about that. Okay. Well, as it is. Thank you. Thank you. Case to start is submitted for decision.
judges: Schroeder, O'scannlain, Tashima